GRACE WINBORN and ELLA WINBORN DAVIS,
Appellants, v. JOHN P. ALEXANDER, Appellee.
—279 S. W. (2d) 718.

Western Section at Jackson.    August 23, 1954.

Petition for Certiorari denied by Supreme Court, March 11, 1955.

P. M. Harbert, and W. W. Lackey, both of Savannah, for appellants.

Ross & Ross, of Savannah, for appellee.

CARNEY, J. The complainants below, Grace Winborn and sister, Ella Winborn Davis, appealed from decree dismissing their original bill filed on May 1, 1951, for a strip of land fronting approximately 60 feet wide on the south side of Water Street in the Town of Savannah, Tennessee, and running back southward approximately 42 poles.

This strip of land lies immediately west of the complainants' homeplace which complainants received in 1941 by inheritance from their father and by warranty deed from their four brothers and sisters. Complainants contended that the lot in dispute was a portion of their homeplace, the title to which they deraigned back through their father, Sam Winborn and his grantor Cub McGee to a deed from J. T. Street to Cub McGee dated March 18, 1878, recorded on April 17, 1880, in Deed Book R, page

82 of the Register's office of Hardin county, Tennessee and the description to said homeplace as shown by deed from Street to McGee is as follows:

"Beginning at a stake at the big gulley on the south side of said Water Street, the same being the northeast corner of a piece of land sold by said Jno. T. Street to Robert Kerr; runs thence south to a stake in the north boundary line of the land belonging to the estate of Thomas A. Kerr, deceased; thence east with the same to a stake in the same, the same being the southeast corner of W. B. Guinn lot; thence with said Guinn west boundary line to the southeast corner of the old jail lot; thence west with the south boundary of jail lot to the southwest corner of the same; thence north with the west boundary line of said jail lot to the northwest corner of the same on Water Street; thence west with said Water Street to the beginning."

The description in complainants' deed dated September 29, 1941, from their brothers and sisters is as follows:

"Beginning at a stake in the big gulley on the south side of said street, the same being the N. E. corner of a piece of land sold by J. T. Street to Robert Kerr; runs thence south to a stake in the N. B. line of the land, belonging to the estate of T. A. Kerr, dec'd., thence east with the same to a stake in the same, being the S. W. corner of the W. B. Guinn lot; thence with the said W. B. Guinn W. B. line to the S. E. corner of the old jail lot; thence west with the E. B. line of the jail lot to the S. W. corner of the same; thence north with the W. B. line of said jail lot to the N. W

corner of the same on Water Street; thence west with said Water Street to the beginning.''

The deed from McGee to W. S. Winborn, father of complainants, dated January 11, 1893, used the expression ''at the big gulley'' just as in the deed from Street to McGee, whereas the deed from the Winborn heirs to complainants used the expression ''in the big gulley.''

The property immediately west of the Sam Winborn homeplace was known as the Welch gin lot and was devised by the will of T. J. Welch upon his death on January 16, 1930, one-half to his son, C. S. Welch, and one-half to named beneficiaries for the benefit of another son, J. K. Welch.

The description to the Welch gin lot as shown by deed of William Anderson to D. A. and T. J. Welch dated April 28, 1884, is as follows:

''Beginning on Water Street, at Cub McGee's northwest corner; runs thence south with said McGee's west boundary line to his southwest corner; thence west with Jane Kerr's & R. East's lines to R. East east boundary line; thence north with said East's east boundary line to Water Street, with said street to the beginning, containing by estimation 6 acres, be the same more or less.''

Later T. J. Welch became the owner of D. A. Welch's one-half interest in the gin lot property.

This 6-acre tract of land was conveyed to William Anderson by J. D. McDougal, Clerk & Master of the Chancery Court, of date October 20, 1883, by virtue of a Court decree of the Chancery Court in the case of D. W. Broyles, Admr. v. D. T. Street.

Complainants introduced copy of a deed from A. H. Kindell et al. to John T. Street dated September 1, 1869,

and filed for registration on July 12, 1870, which conveyed the following described property:

"On the North by Water Street; on the East by the tract of land conveyed to the said Elizabeth Guinn by the heirs of said Elizabeth Kindell, deceased; on the South by A. D. Kerr line; and on the West by the lands of L. H. Broyles (Sr.), and in which bounds are included & excluded the old jail lot lying in the northeast corner of said tract on Water Street."

Complainants insist that this deed, along with other deeds introduced in the record, shows that John T. Street at that time became the owner of both the Welsh gin lot property and the Winborn homeplace, even though there is a link missing in the chain of title on the gin lot property between John T. Street and the deed of the Clerk & Master.

In 1933 the complainants, while their father still owned the Sam Winborn homeplace, and when they were expecting to receive a deed from him to the homeplace, insisted that the west line of the homeplace ran over some 80 or 90 feet further west into the property claimed by the Welshes as being part of the Welsh gin lot. The complainants had a survey made which purported to locate this west line over in the gin lot property, and complainants started putting up a fence along the newly located west line when the Welshes strenuously objected, and particularly C. S. Welsh, who stopped complainants from erecting the fence.

The conditions remained thus with the Welshes in full possession of the Welsh gin lot, including the strip in controversy, until 1942. The complainants were then the owners of the Sam Winborn homeplace and still contended that their true west line was some 80 or 90 feet

over into the gin lot property, but C. S. Welsh and the Trustees for his brother were in possession of the disputed strip.

In 1942 C. S. Welsh and Ralph Barker made an agreement that C. S. Welsh would file suit in the Chancery Court of Hardin County and ask for partition of the Welsh gin property between him and the Trustees for his brother, J. K. Welsh, with the further understanding that if the Court partitioned the eastern one-half of the gin lot property to C. S. Welsh, that he would sell the same to Ralph Barker at a price of $3,000. This agreement seemed to be satisfactory to all interested parties and there seemed to be no doubt but that the Chancery Court would approve the suggested partition. Accordingly, Barker paid C. S. Welsh $3,000 for the eastern one-half of the gin lot property. Preliminary to filing the Bill for Partition, measurements were taken of the gin lot property, which was in the possession of the Welshes, and the total frontage along Water Street was found to be approximately 310 feet. Thus, under the agreement Barker would be entitled to the eastern one-half or 155 feet, and J. K. Welsh would have been entitled to the western one-half or 155 feet.

Since the purchaser, Barker, knew that the complainants were claiming that their west line ran over approximately 90 feet into the eastern half of the gin lot, and he desired to avoid any litigation or trouble, he compromised the dispute with the complainants by agreeing with them that his (Barker's) northeast corner and their northwest corner would be located at a designated and marked point in the south margin of Water Street. The effect of this agreement would be to give the complainants a strip of land fronting some 60 feet wide on Water Street immediately west of the homeplace

property of which they were already in possession. This was 30 feet less than they contended for.

This agreement was approved and ratified by C. S. Welsh, though he later repudiated the same.

C.S. Welch and his brother, J. K. Welch, filed a joint petition in the Chancery Court of Hardin County seeking approval of the partition of the lands which had been agreed upon, reciting, in substance, that J. K. Welsh was to get the western one-half or 155 feet, and that C. S. Welsh had agreed to sell his eastern one-half to Barker and that the eastern half was to front only 97½ feet along Water Street.

The Caption of said Bill for Partition was as follows:

"To The Honorable Tom C. Rye, Chancellor, Holding The Chancery Court At Savannah, Tennessee:

C. S. Welch, individually, and with H. B. Welch, and D. A. Welch Jr., residents of Hardin County, Tennessee, and who bring this bill as trustees, as provided by the will of T. J. Welch, deceased, and in which bill J. K. Welch, a resident of the same county and state, joins,

Complainants

Against

Julian Kenneth Welch Jr., Thomas Lewis Welch, Winnie Davis Welch, Robert Joseph Welch, Sue Paine Welch and Mrs. Adelaide S. Welch, all residents of Hardin County, Tennessee; also that the defendant, Julian Kenneth Welch Jr., is now in the United States Army, stationed at Fort Grant, Illinois, and the said Thomas Lewis Welch is in the United States Army and stationed at Fort Benning, Georgia; and Ralph Barker, a resident of Hardin

**10**

County Tennessee, the said Robert Joseph Welch and Sue Paine Welch are minors without general guardian,

Defendants.''

From said Bill for Partition we quote as follows:

''Complainants state that they have caused a survey of said lot to be made, and the description of the east one-half thereof, to be taken by the complainant, C. S. Welch, under said partition agreement, is as follows, to-wit:

''Beginning at a stake in the south side of Water Street 188½ feet east of the northeast corner of Lot No. 92 on the plan of the Town of Savannah, the same being the N. E. corner of a lot owned by E. P. Churchwell & Son, running thence south through said gin lot 42 poles to a stake in the Churchwell north boundary line; thence east with the same 97¼ ft. to a stake; thence north 42 poles to Water Street, *the same being an agreed corner between said gin lot and the Winborn lot as fixed on said survey;* thence west with Water Street 97¼ ft. to the beginning. (Italics ours)

''The west one-half of said lot being all of the remainder of said gin lot lying west of said line running 42 poles north and south.''

The purchaser, Barker, filed an answer to the Bill for Partition, from which we quote as follows:

''That he admits that he has agreed with C. S. Welch to purchase from him the part of the lot known as the gin lot that lies east of the division line as agreed upon, running north and south 42 poles in length across the lot, and defendant has agreed to pay Three Thousand ($3,000.00) Dollars, cash, *for all of that part of said lot lying east of said division line, as*

*described in the bill, and to the east boundary, as agreed upon by him and Miss Grace Winborn, the owner of the lot lying east of said gin lot; that is to say, on a survey of that part of the gin lot lying east of said division line, has agreed with the said Miss Winborn to the location of the northeast corner of that part of the gin lot to be taken by him, and of the line running south from that northeast corner.* (Italics ours)

"This defendant states that if and when the court approves the partition of said lot between the said C. S. Welch upon the one part, and complainant, J. K. Welch, and his wife and children, who are made defendants to the bill, he stands ready, willing and able to pay to the said C. S. Welch said sum of Three Thousand Dollars.

"All that this defendant desires is to know that he is obtaining a good title in fee to that part of said lot purchased by him, and he submits his rights and interest to the Court for his protection.

"Defendant further states that he was present when the survey was made of said lot, and is familiar with the lines and corners of that part of the same to be taken by him under his contract of purchase, and the description is as set out in bill."

After hearing testimony the Chancery Court approved the partition of said lot and vested and divested title in the respective owners, and from said decree we quote as follows:

"It further appearing to the court from the bill and the answer of the defendant, Ralph Barker, that the complainant, C. S. Welch, has contracted to sell to said Barker and that said Barker has contracted to buy all of that part of said lot lying east of said parti-

tion line and to be taken by the said C. S. Welch, and under this decree title vested in him, and it is therefore ordered, adjudged, *and decreed by the court that upon the execution of any deed or conveyance by the said C. S. Welch to defendant, Ralph Barker, to that part of the lot contracted by and sold to the said Barker, will confer upon and vest in said Barker an indefeasible title in fee and that said Barker as the purchaser under such deed, will acquire and hold title to all of that part of said lot lying east of said division line* free from any claim, right or title of the said J. K. Welch, his wife and children now in being, and any children that he may hereafter have. (Italics ours)

"It is further ordered and decreed by the court that the Clerk & Master make, acknowledge for registration and deliver, upon the payment of legal fees therefor, a deed conveying to the respective parties that part of said lot respectively allotted and set apart as provided by this decree, and he will convey all of that part of said lot on the west of said division line to said trustees to be held by them as such in the same way and manner as is provided by said will."

The decree approving the partition was entered on July 17, 1942, and on July 27, 1942, C. S. Welch and wife, pursuant to said decree, executed a general warranty deed to Ralph Barker and expressly referred to the partition suit. However, the description in the deed from Welch to Barker was exactly as that shown in the original Bill for Partition and conveyed a frontage of 97¼ feet along the south margin of Water Street, except it did not refer to the northeast corner of the east line as being an agreed line between the Winborns and Barker. Immediately upon the consummation of the transaction, Barker proceeded to

erect a mule barn near the east line of his lot. The complainants took possession of the disputed strip and rented the northern portion of the same to Barker for parking purposes.

The lower or southern portion of the lot was shown to be extremely rough and cut up with gullies and so far as the record shows the complainants made no particular use of the lower or southern side of the lot.

On June 26, 1943, the complainant, Grace Winborn, purchased a small frame building from the present defendant, John P. Alexander, and had the same moved several blocks and placed on the lot in dispute, facing Water Street, which was also rented to Barker for storage purposes.

Sometime after conclusion of the sale to Barker, C. S. Welch decided that the Winborns had no title to the lot in dispute since he had deeded Barker a frontage of only 97¼ feet along Water Street when it should have run 155 feet. Welch offered to quitclaim this strip to Barker and Barker refused, saying, in substance, that he had agreed upon the line with Miss Winborn to avoid a law suit. Welch had the disputed strip assessed to him for taxes during the years 1944, 1945, and 1946, showing the east boundary to be Winborn and the west boundary to be Barker.

Sometime during the early part of 1946 C. S. Welch negotiated with defendant, J. P. Alexander, and one Lester Martin to sell them his title to the lot, and they entered upon and took possession of the lot and began grading and fencing, and two or three months later, to wit, on August 12, 1946, they received a quitclaim from C. S. Welch to the lot in dispute at a consideration of $500.00.

Said quitclaim is as follows:

"C. S. Welch

To     )     Quitclaim Deed

John P. Alexander & Lester Martin

In consideration of the sum of Five Hundred ($500.00) Dollars, cash in hand paid, by John P. Alexander and Lester Martin, the receipt whereof is hereby acknowledged, I, C. S. Welch, of Savannah, Tennessee, do hereby demise, release and forever quitclaim unto the said John P. Alexander and Lester Martin, of Savannah, Tennessee, their heirs and assigns, all of my right, title, interest and estate, legal and equitable, in a certain lot or parcel of land, lying and being in the town of Savannah, in the 4th Civil District of Hardin County, Tennessee, bounded and described as follows, to-wit:

Bounded on the north by Water Street, on the east by the Winborn line; on the south by the G. T. Stephens lot, and on the west by the Ralph Barker lot.

"Witness my hand this the 12th day of August, 1946.

C. S. Welch

*     *     *"

They also took immediate possession of the small frame building which Alexander had sold the complainant, Grace Winborn, and have continued to use and occupy the same to the present time, without any compensation to the complainants.

Thereupon Barker, when he heard of these negotiations, and not wanting any competition from other businesses too close to him, and thinking that he had made a mistake in refusing the quitclaim when offered by Welch, tried, to no avail, to get a quitclaim from Welch. Soon after Alexander and Martin received the quitclaim, Barker offered them a substantial profit for the lot, which

they refused. Barker felt so strongly that Alexander and Martin had no title or right to this lot, that in September 1946, he filed a bill in the Chancery Court against Welch, Alexander and Martin, seeking to cancel the quitclaim deed as a cloud upon his title.

Later, by amendment, he impleaded the complainants, referred to the agreement between him and the complainants concerning the line, and in substance, expressed his bewilderment as to the actual situation, but called upon the complainants to prosecute their claim to the lot in good faith, or, in the alternative, that he be given the lot. The complainants filed a cross-bill claiming title to the lot and contending that the deed of Alexander and Martin was champertous and void. The case was continued until 1949 when complainants were permitted to dismiss their cross-bill without prejudice to institute an independent action against Alexander and Martin.

In April 1950 the Chancellor dismissed the bill of Barker v. Welch on the grounds that it was a suit in ejectment and Barker had shown no title to the lot. No appeal was perfected from this decree.

Defendant, Alexander, purchased Martin's interest in the lot and continued in possession of the same until the filing of the bill in this case on May 1, 1951.

Complainants' bill expressly referred to the partition suit and insisted that Welch had no title to any portion of the lot and, therefore, could convey none, and also that his deed to Alexander and Martin was champertous for the reason that they were in possession of the lot at the time of the quitclaim from Welch to Alexander and Martin.

C. S. Welch was dead at the time of the trial of the present cause. He was a witness in the suit brought by Barker, and the record in that case indicates that C. S. Welch

denied that he ever agreed to the location of the line between Barker and the complainants.

The defendant, Alexander, testified and admitted that he was present at the time the survey was made for a division of the gin lot, and he heard Miss Grace Winborn tell Barker that her west line went over into the gin lot further west than the line later agreed upon between Barker and Miss Winborn. He further testified that when they bought the lot from Welch, they just took possession of the frame building which he had sold complainants because it was on the lot which he bought.

The Chancellor dismissed the complainants' bill on the grounds that the complainants' deed did not give title to the disputed lot and that the agreement made between the complainants and Barker as to the location of his east line and their west line was not binding upon the defendant, Alexander, and that, therefore, the complainant having failed to prove title in herself, and the defendant, Alexander, being in possession, complainants' suit must fail.

The complainants have appealed and assigned a number of errors.

The record in this case is somewhat voluminous, consisting of 377 pages, and the two Briefs filed by appellants consist of some 120 pages, and the Reply Brief of appellee 96 pages. It would unduly prolong this opinion to treat all the insistences of all the parties.

We believe that complainants' case must rise or fall upon the validity of the agreement made between them and Barker as to the location of complainants' west line.

In our opinion, the learned Chancellor was in error in holding that the agreement beween Barker and complainants for the location of this line was not binding upon the defendant, Alexander.

When we review the evidence we see that in 1942 complainants were the owners in fee of the Sam Winborn homeplace, legal title to which they deraigned back to 1878 through a regular and uninterrupted chain of conveyances duly recorded, which would give them proper legal title upon which they maintain an action of ejectment.

The west boundary of the Winborn homeplace was in dispute, and complainants bona fide contended that their west boundary line was over in the gin lot. All the owners of the adjacent property, to wit, the gin lot, which included the disputed strip, made an agreement with the complainants for the location of this line. First, Barker, as the purchaser, made an agreement for the location of the boundary line between these two tracts of land; Then, C. S. Welch and all the other Welches who had any legal title to the disputed strip, by their pleading and testimony in open Court, acknowledged the location of complainants' west line to include the strip presently in dispute.

The sale of the land was completed and the purchaser, Barker, took possession of his portion of the land, and the complainants, Winborn, took possession of the disputed strip.

Thus, we see the agreement for the location of the line not only made, but completely executed insofar as all parties having legal or equitable interest in said disputed strip were concerned.

The question is, therefore, presented: Was this executed agreement legal and binding on all the parties: We think it was.

From our review of the cases, it seems to be well settled now in the law that adjacent property owners can make an agreement for the exact location of their joint boundary lines. The only question that seems to have been presented in the different cases is whether or not

the agreement had to be in writing or whether it could be by parol.

From the case of Rogers v. S. W. Taylor & Co., 2 Tenn. App. 445, 450, we quote as follows:

"It is further apparent, and we find, that there was at that time doubt and uncertainty as to the true location on the ground of the boundary line between James Rogers and the Waverly Timber & Iron Company, and that the then existing conditions and circumstances touching the location of said line were such as were reasonably calculated to engender such doubt and uncertainty.

"It is well settled that parties owning adjoining lands may by agreement establish a boundary line between their lands where there is no certain and established line known to them. King v. Mabry, 3 Lea 237, 245; Galbraith v. Lunsford, 87 Tenn. 88 [89] 99 [9 S. W. 365, 1 L. R. A. 522]; Davis v. Jones, 3 Head 602 [603] 606; Nichol v. Lytle, 4 Yerg. 456, 458; Merriwether v. Larmon, 3 Sneed 447, 453; 10 R. C. L., p. 799.

"And under such circumstanes, a parol agreement fixing the boundary line between adjoining owners is not within the statute of frauds. Gilbraith v. Lunsford, supra [87 Tenn. at] page 98 [9 S. W. 365]; Houston v. Matthews, 1 Yerg. 116; 4 R.C.L., p. 126.

"And the parties will be estopped to question the line thus established, even though it may be afterwards demonstrated that such conventional line was erroneously fixed. Galbraith v. Lunsford, supra [87 Tenn. at] pages 98-99 [9 S. W. 365]; Chadwell v. Chadwell, 93 Tenn. 201, 207; Spears v. Walker, 1 Head 166, 168-9; Houston v. Matthews, supra [1 Yerg. at] page 119; 10 R. C. L., p. 799.

"In the case of Houston v. Matthews, supra [1 Yerg.] (at pages 119-120), it is said: 'Another circumstance is, if the parties sell and convey lands by deed on either side of the line, calling for it as their common boundary, and making the lands passed by them to bound upon it, this is the most undeniable circumstance that can happen, upon which to raise the presumption, for a proper estoppel is, where both parties speak in a deed of indenture, which binds and estops both parties equally. Yet there is also another estoppel of one party only, where he makes a deed poll. When both parties, by deeds not between each other, but themselves and third persons, have made deeds, which if made between each other would have been estoppels, they are now with respect to each other, deeds poll estopping the maker, and when that estoppel rests upon both, it is, in principle, equivalent to an estoppel by deed of indenture made between both.''

Likewise, from 11 C. J. S., Boundaries, beginning at page 635, we make the following quotations:

"§ 63. Agreement—Rights acquired by agreement as to boundary lines to land are distinct from rights acquired by adverse possession.

\* \* \* \* \* \*

"§ 64. \* \* \*

"a. In General—A boundary line may be established by an express or implied agreement and such agreements are favored by the law.

"Where the boundary line between two adjoining landowners is uncertain, they may agree on a division line between them, and when executed each will own up to this line as if it were a natural boundary, or

as if their deeds or grants call for it, particularly if the agreement is evidenced by a writing signed by the parties thereto. An agreement may be implied as well as expressed, and, although possession or acquiescence may be necessary, see infra § 67, it has been held that it becomes binding from the time it is made. Such an agreement is not against public policy, but rather, is favored by the law as a satisfactory means of preventing spiteful and vexatious litigation, and every consideration of public policy demands that such an agreement, when all requisites therefor are present, be upheld.

\* \* \* \* \* \*

"§ 65. Consideration—Consideration for an agreement is necessary but the settlement of a disputed boundary of itself constitutes sufficient consideration.

"While a consideration is necessary, the definite settlement of a boundary not previously defined and in dispute, involving as it does mutual concessions, is a good and sufficient consideration to uphold the agreement.

\* \* \* \* \* \*

"§ 67. Parol Agreement—
    "a.  In general
    "b.  Doubt or uncertainty as to true location
    "c.  Dispute
    "d.  Acquiescence and possession

"a.  In General—An uncertain and disputed boundary line may be fixed by parol agreement if accompanied by sufficient acquiescence and possession.

"The validity and legal force of parol agreements to settle disputed boundary lines was resisted in early

cases on the ground that, in effect, they passed the title to real property without the solemnities required by the statute. However, it is now the general rule, in some jurisdictions affirmed or announced by statute, that an uncertain and disputed boundary line may be fixed by parol agreement if the requisites of acquiescence and possession, hereinafter discussed, are present. Such an agreement is not prohibited by the statute of frauds, nor is it within the meaning of the provisions of the law that regulate the manner of conveying real estate. The reason for this rule is based on the idea that the parties do not undertake to acquire and to pass the title to real estate, as must be done by written contract or conveyance; but they simply by agreement fix and determine the situation and location of the thing that they already own, the purpose being simply by something agreed on to identify their several holdings and to make certain that which they regarded as uncertain. To constitute a valid agreement by landowners, there must be an intent to determine or settle the permanent location of the line. The agreement must be definite and unconditional, and must concern a boundary line between contiguous tracts. * * *''

In the case at Bar, Barker was the equitable owner of the real estate adjoining the complainant's property, and he, in good faith, made a definite agreement for the location of their mutual boundary line. He never at any time repudiated the agreement, even by filing his suit for the possession of the property, and has at all times admitted that the agreed line was the true line between his property and that of the complainants. We think this agreement was valid and binding upon the complainants and upon Barker and upon all the Welches,

who had been owners of the gin lot, and particularly binding upon C. S. Welch, who had agreed to sell all of his interest in the gin lot to Barker.

However, counsel for defendant insist that the agreement between Barker and the complainants for the settlement of the boundary line was by parol and, therefore, came within the Statute of Frauds. In our opinion, if it should be determined that the agreement came within the Statute of Frauds, the defendant's position is not helped. The requirements of the Statute of Frauds were fully met and satisfied by the acts of C. S. Welch in swearing to and filing the original Bill for Partition in the Chancery Court of Hardin County on June 26, 1942, in which he expressly locates the northwest corner of the Winborn property as the northeast corner of the 97¼-feet frontage on Water Street which Welch had contracted to sell to and later did sell to Barker. Likewise, Barker admitted in writing the establishment of said boundary line.

Since we hold that the boundary line as agreed upon by the parties was the true west boundary of the complainants' property, then whatever possession the Welches had formerly had of the lot in dispute was merged into the agreement and their possession of the dispute strip became complainants' possession of the disputed strip.

Upon the consummation of the agreement, C. S. Welch had fully approved and ratified the establishment of said line and he had no further title, legal or equitable, to any part of the gin lot property or to any part of the Winborn property. The decree of the Chancery Court had already provided that upon execution of a deed from Welch to Barker that he (Barker) would own all of the gin lot east of the dividing line.

■ Since Welch had no title left, legal or equitable, to any part of the gin property, and had no title to any part of the Winborn property, his quitclaim deed to Alexander and Martin conveyed no title.

■ Alexander and Martin, having physically and forcefully ousted complainants of the disputed strip in 1946 by taking over the possession of said property, without any title thereto, were, in effect, trespassers.

■ Therefore, it appears to us that the complainants have proved over twenty years' actual possession under a recorded instrument purporting to give a fee simple title to their homeplace, which included the lot in dispute, and they were entitled to a judgment for the possession of this lot against the defendant, Alexander, who had ousted complainants without any legal title and who had held possession of the lot for less than the required seven-year period.

■ It is insisted by solicitors for defendants that the complainants' action is barred by the Statute of Limitations as provided by Section 8572 of the Code, which is as follows:

"8572. 4446 (2755). New action within one year after inconclusive judgment, dismissal, arrest, or reversal.—If the action is commenced within the time limited by a rule or statute of limitation, but the judgment or decree is rendered against the plaintiff upon any ground not concluding his right of action, or where the judgment or decree is rendered in favor of the plaintiff, and is arrested, or reversed on appeal, the plaintiff, or his representatives and privies, as the case may be, may, from time to time, commence a new action within one year after the reversal or arrest."

Complainants originally filed a cross-bill in the suit of Barker v. Welch and Alexander on November 14, 1946. This suit was dismissed without prejudice on July 5, 1949. The present bill was filed on May 1, 1951. Under the authority of Dushan v. Metropolitan Life Ins. Co., 14 Tenn. App. 422, we hold that the above statute does not apply since the complainants filed the present bill within the seven years period of limitations covered by Section 8583 of the Code of Tennessee.

The defendants also contend that the complainants are barred by the doctrine of laches in that they stood by and let the said Alexander and his co-tenant, Martin, erect valuable buildings on the said property. With this insistence we must respectfully disagree. In the first place, we don't find much equity in favor of the defendant, Alexander. He was present and saw and heard Barker and the complainants discussing the exact location of complainants' boundary line. In addition, he sold complainant the very buliding which complainant moved on the disputed lot. It is reasonably certain that he knew that complainant was claiming title to, and substantially in possession of, the whole lot by receiving rentals from Barker, and that Alexander and Martin tried to circumvent the provisions of Section 7824 of the Code relating to champertous deeds by ousting complainants' and taking possession of the lot before actually receiving a quitclaim deed. Further, Barker made known his objections to them having the lot and offered, not only to reimburse them for the money they had paid out, but offered them a very substantial profit above the money they had paid for the quitclaim deed.

While Barker's suit was pending and while complainants' cross-bill was pending in the Chancery Court of

Hardin County, that is, during the period from 1946 to 1949, the defendant, Alexander, and his former co-tenant, Martin, erected a major portion of the improvements which are on the lot in dispute. We do not see that the failure of the complainats to file their action in this case for two years after dismissal of their cross-bill resulted in such prejudice to the defendant, Alexander, as to require this Court to apply the doctrine of laches: Cooper v. Great Falls Cotton Mills Co., 94 Tenn. 588, 30 S. W. 353.

Furthermore, defendants insist that complainants' action is barred by the provisions of Section 1959.1 of Williams' Code of Tennessee, which was Chapter 28 of the Acts of 1947, and which provides as follows:

"9159.1. No action to recover land or profits therefrom unless taxes paid for twenty years.— Any person having any claim to real estate or land of any kind, or to any legal or equitable interest therein, and the same having been subject to assessment for state and county taxes, and such person and those through whom he claims having failed to have the same assessed and to pay any state and county taxes thereon for a period of more than twenty years, shall be forever barred from bringing any action in law or in equity to recover the same, or to recover any rents or profits therefrom in any of the courts of this state; provided, that this act shall not apply to persons under twenty-one years of age or to persons of unsound mind if suit shall be brought by them, or any one claiming through them, within three years after the removal of such disability."

In our opinion, this Section does not apply to the case at Bar because it does not appear that complainants failed to pay any taxes on their property, and they were

claiming the disputed strip as a portion of their home-place and not as a separate lot or parcel of land. Further, we do not think the Section would bar complainants' action because it does not appear that complainants or those through whom they claimed, failed to pay taxes for the prescribed twenty-year period.

We do not find that complainants' evidence was sufficient to prove that complainants' true west line was at the point originally insisted by them, or that it even went as far west as the agreed line. However, we do hold that under the authorities referred to above, the legal effect of the agreement between complainants and Barker and C. S. Welch et al., for the establishment of complainants' west line at the agreed location was to make such agreed line the legal west line of the Winborn property just as if it were set out in complainants' deed.

We do not deem it necessary to determine whether or not the deed from the Kindell heirs to John T. Street covered and included both the Welch gin lot and the Winborn homeplace as insisted by complainants. We hold that it was not necessary for complainants to deraign the title to both the gin lot and the Winborn homeplace to a common source, as complainants attempted to do, and insist that they have done. On the contrary, we hold that since the complainants proved that they, and those through whom they claimed, had been in actual possession of the property in dispute for more than twenty years while holding under a registered instrument of title purporting to convey them a fee simple, the complainants proved such title as would sustain a suit in ejectment.

In ejectment, complainant may show title either by grant, by seven years' adverse possession under color of title, or by twenty years' adverse possession. Demar-

Further, when the complainants proved that the defendant ousted the complainants from possession and claimed under a quitclaim deed from C. S. Welch, who at the time of the execution of said quitclaim was not in possession and had no legal title to the lot in dispute, it was not necessary for complainants to deraign the chain of title beyond C. S. Welch.

Therefore, we sustain complainants' Assignments of Error No. 5, No. 6, No. 7, and No. 8 and do not deem it necessary to rule upon the other Assignments of Error separately.

A judgment will be entered reversing the action of the Chancellor and adjudging the complainants to be the owners in fee simple of the lot or parcel of land in dispute and entitled to a writ of possession against the defendant, J. P. Alexander.

The cause will be remanded to the Chancery Court of Hardin County for determination as to the amount of rent due and owing by defendant for the use of said land and for further and final proceedings not inconsistent with this opinion.

The defendant is taxed with the costs of this appeal and with the costs of the trial below.

Avery, P. J., and Bejach, J., concur.